We'll now hear argument in our final case of the day, which is National Pork Producers Council v. Ross. I believe that, let's see, is it Mr. Bishop? How are you two dividing the, I guess it's the defendant, the appellees that are dividing time. You have the whole time, right? I do, and I'd like to try to save three minutes for rebuttal. Okay. May I please call Tim Bishop for the appellants, the National Pork Producers Council and the American Farm Bureau Federation. The district court should not have dismissed this suit because our allegations state a claim that Proposition 12 has the practical effect of regulating extraterritorially, which is the issue I'll focus on first. As we and the United States Department of Agriculture in its brief in 20 states in their brief have explained, nearly all of the pork produced, consumed in California is produced outside the state. 99.8% of the pork sold in California comes from elsewhere. Let me ask you this, since we don't have a long, long, long time on this. Why isn't your case, I mean just back up for a second here. It seems to me that much of your argument is focused on some regulations that have not yet been promulgated officially. So we want to put those to the side. We're talking about Proposition 12. But just looking at that, why isn't your case foreclosed by Rocky Mountain Farms Union versus Cory American Fuel versus O'Keeffe, the Allure de Canard case, the Chinatown Neighborhood Association versus Harris? Don't all those cases say that you don't have any traction? In your case? No, I don't think so. I mean, you know, the dormant commerce clause analysis of what if impact a law has extraterritoriality is fact specific. And here I want to focus on two sets of allegations that we make that were not present in any of those cases that weren't present in the NAMI case that Judge Kuta sat on earlier in the year. And one of these is a feature of the pork product. It's what I call the one pig issue. So a farmer can only raise a sow that gives birth to a market pig in one way. But a cut of meat from the market hog is what's sold, not a whole hog. And cuts from a market pig reach different states. According to demand. So the result of that is that Proposition 12's costs for housing a sow are translated into costs for cuts of meat that are not sold into California, weren't raised in California, have nothing to do with California. And that's going to distort prices throughout the national market. And that has nothing to do. Let me stress that that has nothing to do with whether you can trace a cut of meat from a sow to determine that it's Prop 12 compliant, even assuming that every cut of meat could be traced, which we say is impossible. Many Prop 12 compliant cuts of meat that come from a market hog, that come from a sow that bears all of those costs of compliance with Prop 12 are not going to be sold into California. Demand just doesn't allow that. Demand varies regionally. You say that the pork industry inherently requires a uniform system of regulation. Do you have a uniform system right now? Well, let me stress one thing, Judge Smith. That's not the point I just made. This doesn't depend on uniform regulation. This depends on one fact. The Prop 12 compliant sows, that they're piglets, when they go to market, are not all sold in California and that that is impossible because the supply follows demand. So a lot of those market cuts that are Prop 12 compliant, that bear all those costs, are going to be sold from a supplier in Nebraska to a consumer in Illinois. They're not going to touch California at all, but they will bear those costs. Now, no, we don't have it. But that's their choice, is it not? If they don't sell in California, they're not affected. It's a choice they make. No, and that's because in this industry, the packers slaughter the pigs and distribute them. You don't know if your sow farmer, which is our clients here, our members are sow farmers, not the packers. The sow farmer does not know where, six months down the line, the packer is going to sell the meat in those pigs. And the packer doesn't know six months before. And so what's happening is, and this I think is inevitable, is the packer says, I don't know where I'm going to sell this meat. You, supplier, need to comply with Proposition 12. I can't trace every cut of meat that comes from hundreds of farms coming into this processing plant. And so you, sow farmer, need to comply with Prop 12. That's going to have immense effects and is already having effects because the costs of compliance, no one in the pork industry in the United States complies with California's requirements of 24 square feet per pig. Virtually everyone in the industry for both efficiency and sow welfare use individual stalls for at least the period after weaning when sows are weak and need protection. Things that Prop 12 prohibits. Let's say all of that's true. The reality is you're suggesting that the pork industry needs uniformity because of what you just described. You really don't have a uniform system. Now, for example, you bring up in your briefs that Ohio law has a particular set of regulations and things that you have to comply with. So you really don't have uniformity even now, even before Prop 12, excuse me. Well, we do, Your Honor. There is no other state that requires this sort of square footage. In fact, states do not require square footage. The Ohio law is important because it allows something that virtually every farmer in the United States does, which is to use individual stalls post weaning until pregnancy is confirmed. Specifically allows that. California law specifically prohibits that. You can comply with the Ohio law by complying. You know, there's no direct conflict. It's not Ohio says you must use it. But Ohio's decided, the regulators there have decided, this is a good thing that sow farmers ought to be able to do for the welfare of their sows. And California says, no, you can't do that. Which is why 20 states have filed an amicus brief here saying that California's law infringes on their control. I'm having trouble with our opinion in Oliver's where we held, we're not interfering with production processes outside of California. But if you want to sell in California, you have to not force feed the birds. And you can only sell, I guess, if you hand feed them walnuts or hazelnuts or however it was done in Spain. And we have held that even though if anyone wanted to sell in California,  no, but what it wouldn't have, Judge Okuda, is it wouldn't have an effect on totally extraterritorial sales. Things that don't touch California. The reason is that in the Oliver case, the bar was on selling the liver in California if it was force fed. There was no bar on selling the other parts of the meat. The opinion expressly says that. So the other parts of the duck meat could be sold in California or anywhere else. And the liver can't be sold in California, but it can be sold elsewhere. You don't have this knock-on effect that you have with pigs, that you have all of these cuts of meat that have come from a Prop 12 compliant pig that are not going to be sold into California. So there's this inevitable effect on price and supply that is totally extraterritorial. Our focus in Oliver seemed to be on the sales in California. And I think Judge Smith also mentioned Rocky Mountain, where we said all we care about is getting the information about the fuel production if you sell it in California. So here we're just saying you can do your pork production however you want, but if you sell it in California, then it has to come from compliant. Well, that isn't all you'd be saying. By throwing out this case below, what the judge has said is that not only that you can't sell this stuff in California and you can choose to sell elsewhere, he's saying that anyone who complies with Prop 12, people in other states who buy cuts of meat from that pork, which can't all be sold in California, are going to bear the costs. They're going to bear the costs of California's compliance. So there is no market outside California for meat that satisfies these requirements. How do you know? Because if there was, then the market would have responded by now. I guess what I'd like to add here, it seems to me that what you're focused on is regulations that might follow on from Prop 12. But if you look at the Prop 12 itself, what specific language in Prop 12 do you cite for your extraterritoriality? I know you're saying that there is a, if you will, a side effect. It's not a side effect, it's a direct, you know, the extraterritorial inquiry into whether there are direct effects on extraterritorial commerce. We have alleged, and remember we're at the motion to dismiss stage, we're asking for a chance to prove our case below, that when you devote 24 square feet to a cell, when you do not, when you cannot individually house it in the pre-pregnancy period, that the result of that is that those immense costs, $3 million for just one of our declarants to conform to that, are going to be borne by every single market hog borne by that cell. And those market hogs are not and cannot, because of the supply-demand equation, be sold in California. They're going to be sold in Illinois and in Michigan and lots of other states where the consumers do not want to pay for California's preferences for cell housing. Would that have been true of auto emissions as well? Well, auto emissions are federally regulated, Your Honor. I understand that, but I mean, it was California's emissions. We got a special waiver to do that. You got a waiver. But the reality is other states had no problem adopting it, it was just fine. Without the waiver, California would not have been able to do that. Correct, and I realize that these are fact-specific cases. You have to look at the particular product and the particular industry. But the epitome of an extraterritorial effect is forcing the consumers in other states to pay for your state's preferences on housing. Other than Legato, the Legato papers case, are there any cases supporting your theory? Because it follows that the Supreme Court said, now we limit heely involvement to... Well, we don't think that's right, Your Honor. We realize that this court has adopted the sort of price affirmation, but we are alleging a price effect. So we think even if that's the law, which we don't believe it is, and Your Honor, there are at least two cases from this circuit, Daniel Sharpsmart and NCAA v. Miller, that find extraterritoriality violations with no price impact. And the most recent of those is 2018. So these are not old cases. And I would urge the court to perhaps take a look at the 20-state amicus brief order in support of the petition in the NAMI case, which is the best treatment I've seen of how that price limitation on the extraterritoriality provision is out of whack with Supreme Court law and with the law in other circuits. But I would point the court to Daniel Sharpsmart and NCAA v. Miller, which find extraterritorial impacts without a price impact. We think we have alleged price impact. I would like to save the remainder of my time, please. Very well. All right. So we now have two gentlemen. Mr. Wise has 10 minutes, and then Mr. Wegman has five. So Mr. Wise, if you'd like to proceed. Thank you. Good morning. May it please the court, Matthew Wise, Deputy Attorney General for the State Defendants. This court is well familiarized with the legal issues in this case. In keeping with the Supreme Court's decision in pharmaceutical research v. Walsh, this court has repeatedly affirmed the fundamental principle of federalism at stake here. That each state is permitted to regulate commerce within its borders. This circuit's fuel standard, optometrists, and animal cruelty decisions have, as this court recently put it in Rocky Mountain II, established a well-worn path of precedent. Proposition 12 is the same in every material respect as the laws upheld in those cases. It applies only to sales in California, and it addresses activities that do not require a national system of regulation. If I understand the appellant's argument correctly, it's that the pork production industry is so integrated that, and California has 13 percent of the market, that as a practical matter, the effect of this law is to require the entire industry to change to conform to California law, which, of course, California doesn't have the authority to require. That would have to be from Congress. Why isn't that theory correct? Proposition 12 does not control wholly out-of-state conduct. There's a bright line between laws like the ones in Brown, Foreman, and Healy that control wholly out-of-state conduct, in those cases by requiring in-state approval before setting out-of-state liquor prices, and laws like the one in Walsh that have an upstream effect on out-of-state entities, but permissively regulate in-state sales. It's, of course, common for a state law to have a practical effect of imposing an additional cost on all producers, but that alone does not make a law regulate extra charge. Is there any case analogous to this one, where the allegation, at least for purposes of a motion to dismiss in the complaint, says that the entire industry is affected, and within, between entities that are fully out-of-state, in other words, between the South, Armour, and the Packers. So that's the allegation in the complaint. Is there any case that said that was not an extraterritorial effect? Well, I'm not sure that the issue of whether it's on a motion to dismiss, or preliminary injunction, or some other procedural posture in the case really makes a difference here. We're talking about the legal issues, and we can look to cases like Walsh, the fuel standard cases, you know, a number of other cases in this circuit, and, you know, what's indicated here, particularly if we look at Walsh, you know, that's a critical decision. The court counsel barely addresses that case, and the court rejected an extraterritoriality challenge, even though the law was alleged to have had a practical effect on the out-of-state transactions of out-of-state manufacturers and distributors, reducing the net benefit of those sales, and yet the Supreme Court held that that law permissively regulated in-state sales. Proposition 12 controls only the sale of pork products in California, and so it is analogous to Walsh, and, you know, that's the common thread between Walsh and the cases in this circuit, the fuel standard, optometrists, animal cruelty decisions, is that states have always been permitted to exercise their sovereign power over sales within the state. Mr. Weiss, if we take as a given what Mr. Bishop says about the, if you will, the integrated nature of the pork industry and the fact that you've got different producers, deal with other producers, and they just deal with a common requirement, it does seem like there will be increased cost because there's increased footage required for these animals. Doesn't the increased cost affect our analysis of the substantial burden on this act? Well, to, and so looking at the pike balancing, is that the question? Right. Right. Well, you know, this court has looked at pike balancing from two perspectives. All of the cases address either laws that were discriminatory or laws that have the effect of, you know, requiring a uniform system of regulation, and, you know, this case, of course, there is no allegation of discrimination. I think that's really important because a central concern of the Dormant Commerce Clause is protectionism, and if there's no allegation here that Proposition 12 is protectionist, then that's, you know, that means this really isn't going to the core concern of the Dormant Commerce Clause. And so then that, you know, second area is really the cases like the, you know, the mud flaps or train lengths cases, and this case doesn't fit within that category. The Pork Council's complaint only alleges that some packers and food distributors will require their products to be Proposition 12 compliant. You know, at pages 23 and 24 of our answering brief, I believe we addressed that concern. We looked at their allegations, and it says, you know, pork products will become more expensive. Producers may choose to comply with Proposition 12 by doing this or that. Some, you know, some different things may happen. It's essentially arguing, you know, what has been rejected in Exxon at the Supreme Court level by the fuel standard and optometrist cases in this circuit. So it's the same argument that has, you know, never found success in this circuit. The other argument that's somewhat similar, it's under the extraterritoriality claim, is this NCAA v. Miller argument. And the Pork Council's reliance on Miller is misplaced. They did not and they could not allege plausibly that national uniformity is required in the pork industry's operations. Miller addressed an inherently interstate industry, the NCAA, that required uniform enforcement procedures to accomplish its fundamental goals. This Court has consistently recognized, in the Foie Gras case most notably, that Miller does not apply where the challenged law does not impose the sole production method that plaintiffs must follow. And here, again, the Pork Council alleges that pork products will become more expensive, that the producers may have to change their production practices, but not that the pork industry requires a particular production method to meet its fundamental goals. And so, again, I thought Prop 12 does require a specific production method. That was the whole purpose. The whole point of it was to raise the sows in a specific way. It's a very unlike Elovers, which just says you can do it any way you want, as long as it's not forest feeding. This is specifying how it has to be done. I guess I don't follow your argument. Proposition 12 requires a particular square foot standard for the products that will be sold in California. And as I understand it, the Pork Council is making the argument that that requirement somehow controls their wholly out-of-state conduct. Now, Proposition 12 is indifferent to the sale of pork products in other states. Right, but the Supreme Court definitely looks at what happens as a practical matter and how it affects the industries as a practical matter. So we can't ignore the argument, especially at the motion to dismiss stage, where we take allegations as true, as long as they're plausible, that this will, in fact, affect the entire industry. Right, and that's where we go back to that distinction between Brown-Foreman and Healy on the one hand and Walsh on the other. It's certainly true that laws can have a practical effect on out-of-state conduct. That's called an upstream effect in the case law. But the practical effect must be to control wholly out-of-state conduct. And it's striking in the Pork Council's briefing that they really don't focus on that control element. They mention practical effect a lot. They talk a lot about that particular line in Brown-Foreman and Healy. But that's what's missing here. Well, California can't pass the laws, and Nebraska has to follow Prop 12 standards. The only way that California can have an effect on interstate commerce is by saying, if you don't, you can't sell in California. So the Supreme Court acknowledges that. So that's a form of control, a very specific operational aspect of what happens with South Harvest in Nebraska. Right. And I think that another way of looking at this is looking at this court's precedent, is to look at when this court has found that a law regulates extraterritorially. And so we could look at Christie's, the en banc decision there. And the portion of the law that was struck down was the out-of-state part resales. The remainder of the law that regulated in-state was left. It survived. And Christie's specifically distinguished laws like the ones in the fuel standard cases, the Foie Gras case, Walsh, as being permissible regulations of in-state sales. And any other questions of Mr. Weiss by my colleague? OK, Mr. Wagnon, you have five minutes, please. Yes, thank you, Your Honor. May it please the court, Bruce Wagnon for the interveners. I think one of the issues that Judge Ikuta just focused on was something that's important to understand, the difference between regulation and effect. In the Healy case, which had direct regulation of wholly out-of-state transactions, that's where the court looked at the effect. But here we have regulation only in the case. I thought that the law only affected sales here in that state. They just said, if you want to sell in the state, you have to give us a price affirmation. Again, it was indirect. Obviously, one state can't control what happens in another state. They do it by an indirect rule. It's the cost of sales. The court in Healy found that the direct regulation was out-of-state, and that's why they looked at the practical effect. Here we have... I find that here as well, right? Because obviously, if you want to sell in California, you have to conform to very specific requirements. With respect to those specific requirements, Judge Ikuda, I also wanted to note that Prop 12 is simply a floor. It's not a requirement. You can go more than 24 feet. You can use something different. You just can't use the inhumane treatment that California has found is inhumane. But what plaintiffs are trying to do here is a complete reimagining of dormant commerce clause jurisprudence, based on the cases that were cited by Judge Smith, as well as the Cloverleaf and the Walsh case. If you think about the Cloverleaf case, there, where they were required to have new kinds of bottles for the milk in-state, everybody out-of-state had to change their production. Only if they wanted to sell in-state, it didn't affect anything they did out-of-state. It seems very similar to this case. They were able to sell, use whatever bottles they wanted, as long as they sold out of that state. And that's the same thing here, Your Honor. Despite the fact of what court counsel is trying to say, they do not say in any way that the entire industry is affected, or that they are a uniform industry at all. In fact, in their complaint, they make it clear that there are multiple paragraph 58 notes that the court counsel's members house pigs in both group pens and individual stalls. They supply specialty markets. They frequently supply multiple markets and suppliers with different requirements. Basically, what they're saying is, once a business gets so big that it has a corporatization that requires all of these integrated transactions, then it can override the police power of any state. The health institution— Let me ask you this, counsel, in connection with uniformity. Do the pork producers, for example, in, say, the southeast, you know, Georgia, the Carolinas, Florida, and so on, would those pork producers, under any circumstances, be selling their pork in California on a regular basis? If you're asking me where the pork comes from, Your Honor, I'm not exactly sure. But I do know that 13% of the pork goes to California, but 87% goes elsewhere. And certainly, it's the cost of doing business to decide where you want to sell your pork. And they can't say that we've set up this construct, this business model, and so you can't enact laws that protect health and safety in the state, that protect animal welfare in the state, because we don't want to change— It doesn't protect animal welfare in the state, right? It's only out of state. Because Prop 2 already restrains activities within the state. So this is all about the animal conditions outside of the state, as I understand it. Not at all, Your Honor. As the Elevores, the Flog Rock case recognized, California has the right to not be complicit in animal cruelty. I did not see Elevores establishing the non-complicit rule, but I will take that. And absolutely, any state has the right to say that it does not want to see the products of animal cruelty on its shelves. I don't have the exact site, but the Elevores case definitely did say that, Your Honor. And that is part of the purpose, and a reasonable purpose. There is also an important health and safety issue, as we mentioned— Does that look like a spiritual issue, as opposed to a health and safety issue? Is there any health and safety issue in California? Absolutely. The complicit in animal cruelty issue, Your Honor, is a morals issue, of course. We don't want to see the products of animal cruelty on our shelves, but there is a health and safety issue. We cited Judge Wilkinson's opinion in the MacGyver case, and we're just coming out of a pandemic, both of which suggest that treating animals in certain ways leads to health and safety issues and public problems. And so there's no question about the wisdom of Proposition 12 in trying to limit the products of that kind of cruelty coming into California. Okay. Do either of my colleagues have additional questions for Mr. Wagner? Okay. Back to Mr. Bishop, before we start your time, I have a question I really want to ask, because I used to do a lot of negotiating, and we always heard that pigs get fat and hogs get slaughtered. Is that correct? That sounds about right. All right. Look, Mr. Wise and Mr. Wagner are not taking seriously the allegations in our complaint. And Mr. Wagner can testify all he likes about what's humane for hogs and sows and what health effects there are. But we make very specific allegations that Prop 12 is bad for sows and that there are no health effects. But the bottom line is here, do we think that California could say, we will not allow anyone in California to buy products unless they are produced by a manufacturer who pays their workers $20 an hour? Because that's the equivalent of what's happening here. With respect, if I understand correctly, and I think Mr. Wagner just used this as a figure, 87% of the pork that is produced in the United States goes elsewhere. It doesn't go to California. And it bears the cost of Prop 12. But wait a minute. I know you're saying it's all integrated, but let's just say you've got people in one part of Iowa and so on that basically focus primarily on the East. It doesn't have anything to do with California. That takes the uniformity out of it, does it not? Well, no, that doesn't happen. I mean, the market is very demand dependent. And so the supply follows the demand. I mean, it's seasonal, depending on the weather in particular parts of the country. It depends on the population and what sort of cuts they like. You can't sell, you don't sell whole hogs into California. You butcher the hog into dozens of dozens of different cuts, which are then sold wherever the demand is. And every one of those cuts bears the cost of Proposition 12. And let me ask my colleagues, the time is up, so let me ask my colleague to either have additional questions for Mr. Bishop. No, thank you. You thank, go ahead. None, you say? Okay, we thank all counsel. You're very learned lawyers. We appreciate your arguments. Very helpful to us. The case of National Pork Producers Council versus Ross et al is submitted. And the court stands adjourned for the day. Thank you.
judges: M. Smith, Ikuta, Steele